*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0004

SALEM MEDIA GROUP, INC., APPELLANT,

V.

IMRAN AWAN, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-000652-B)

(Hon. Fern Flanagan Saddler, Trial Judge)

(Argued March 29, 2023                    Decided September 7, 2023)

*Gabriela Richeimer* for appellant.

*Deepak Gupta*, with whom *Kyle Farrar*, *Mark Bankston*, *Hassan A. Zavareei*, *Allison W. Parr*, *Spencer Hughes*, *Leora N. Friedman*, *Peter Romer-Friedman*, *Robert Friedman*, and *Neil K. Sawhney*, were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, ALIKHAN, *Associate Judge*, and GLICKMAN, *Senior Judge*.

GLICKMAN, *Senior Judge*: In 2019, appellant Salem Media Group, Inc., published a book titled *Obstruction of Justice: How the Deep State Risked National Security to Protect the Democrats* (hereinafter, *Obstruction of Justice*). The book details its author Luke Rosiak's investigative journalism into the activities of

appellees Imran Awan, Abid Awan, Jamal Awan, Tina Alvi, and Rao Abbas. These five individuals, whom the parties have referred to collectively as "the Awans," are former information technology support staff employed by the U.S. House of Representatives. As previously had been reported in the news media, the Awans were investigated for alleged violations of House policies and possible crimes relating to equipment procurement, IT security, and other job-related matters. The Awans sued Salem for defamation, intentional infliction of emotional distress (IIED), and unjust enrichment based on Rosiak's statements in *Obstruction of Justice* regarding their alleged misconduct.

This interlocutory appeal is from the denial of Salem's "special motion to dismiss" under the District of Columbia Anti-Strategic Lawsuits Against Public Participation (Anti-SLAPP) Act.[1] The Anti-SLAPP Act was passed to protect the targets of lawsuits aimed at punishing or preventing the expression of opposing points of view on matters of public concern.[2] The Act allows the defendant to file a "special motion to dismiss" to test the legal and factual sufficiency of the claims early in the litigation. The defendant must first make a "prima facie showing that

---

[1] D.C. Code §§16-5501 to -5505.

[2] *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016).

the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest."[3]  If that showing is made, then the burden shifts to the plaintiff to demonstrate "that the claim is likely to succeed on the merits."[4]  "[T]he court evaluates the likely success of the claim by asking whether a jury properly instructed on the applicable legal and constitutional standards could reasonably find that the claim is supported in light of the evidence that has been produced or proffered in connection with the motion."[5]  If the plaintiff's showing fails, then the special motion to dismiss must be granted.

The Anti-SLAPP Act special-motion-to-dismiss procedure functions essentially like an early motion for summary judgment under Superior Court Civil Rule 56.  There are important differences, however — among them, that the special motion to dismiss "requires the court to consider the legal sufficiency of the evidence presented before discovery is completed."[6]  In the present appeal, the Awans have

---

[3] D.C. Code §16-5502(b).

[4] *Id.*

[5] *Mann*, 150 A.3d at 1232.

[6] *Id.* at 1238 n.32.  The Anti-SLAPP Act provides that "upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of," subject to the proviso that "[w]hen it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the

not challenged the discovery-limiting aspects of the special-motion-to-dismiss procedure, nor have they complained that the restriction of their ability to take discovery prejudiced them in responding to the special motion in this case. Accordingly, we do not opine on that subject in this opinion. We note, however, that in another appeal decided on the same date as this one, this court has held that the Anti-SLAPP Act's restrictive special-motion-to-dismiss discovery provisions violate the Home Rule Act because they conflict with the more liberal discovery provisions of Rule 56 and therefore are "inoperative or unenforceable."[7]

Salem moved under the Anti-SLAPP Act to dismiss all three causes of action asserted by the Awans. The trial court denied Salem's motion in full. Salem argues that the trial court erred and that each claim should have been dismissed.

---

discovery will not be unduly burdensome, the court may order that specified discovery be conducted." D.C. Code §16-5502(c)(1), (2).

[7] *Banks v. Hoffman*, No. 20-CV-318, slip op. at 44 n.33 (D.C. Sept. 7, 2023). As explained in *Banks*, the Home Rule Act provides that "[t]he Council shall have no authority to . . . [e]nact any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia Courts)," D.C. Code §1-206.02(a)(4). In Title 11, D.C. Code §11-946 provides in pertinent part that "[t]he Superior Court shall conduct its business according to the Federal Rules of Civil Procedure . . . unless it prescribes or adopts rules which modify those Rules" and such modifications are approved by the Court of Appeals. (Superior Court Civil Rule 56 is based on its federal counterpart.)

First, Salem contends the court erred in failing to dismiss the Awans' defamation claim for lack of sufficient proof of malice on Salem's part. Recognizing that the goal of compensating persons who are harmed by the publication of libelous falsehoods may be in tension with the core First Amendment goal of protecting vigorous speech and debate about issues of public interest, the Supreme Court has held that certain plaintiffs asserting defamation claims directly implicating that constitutional concern must prove the defendants acted with a heightened degree of culpability in publishing the injurious lies. Specifically, plaintiffs who are considered to be "public figures" must prove the defendant defamed them with "actual malice," a more demanding fault standard than the simple negligence standard that otherwise would apply to claims of defamation asserted by private figures.[8] In the present case, Salem contends the Awans had to prove it published the libels in *Obstruction of Justice* with actual malice because each of them was a "limited-purpose public figure," a term used to describe a person who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."[9] Alternatively, Salem argues that the

---

[8] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (1974); *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 85-86 (D.C. 1980).

[9] *Gertz*, 418 U.S. at 351.

Awans became "involuntary public figures," a term reserved for persons who are so central and well known with respect to a particular public controversy that they become public figures even if they do not desire or seek the public's attention.[10]

The Awans were employed as IT support staff at the House of Representatives and had no involvement with the press prior to the government investigations. We conclude that the trial court properly found, on the evidence before it, that the Awans were not limited-purpose or involuntary public figures based either on their voluntary actions with respect to the public controversy surrounding them or their centrality and prominence with respect to that controversy. The trial court therefore did not err in rejecting Salem's special motion to dismiss the defamation count of the Awans' complaint for lack of proof of actual malice.

Second, Salem argues that the trial court erred in denying its special motion to dismiss the Awans' IIED claim. Such a claim requires a plaintiff to prove that the defendant engaged in "extreme and outrageous conduct" that "intentionally or recklessly" caused the plaintiff to suffer "severe emotional distress."[11] We agree

---

[10] *See, e.g.*, *Dameron v. Wash. Mag., Inc.*, 779 F.2d 736, 742-43 (D.C. Cir. 1985).

[11] *Mann*, 150 A.3d at 1260.

with Salem that, in accordance with the Anti-SLAPP Act, the court should have dismissed this claim for lack of sufficient evidence that Salem's publication of *Obstruction of Justice* amounted to "extreme and outrageous" conduct.

Lastly, the Awans' unjust enrichment claim seeks disgorgement of the profits Salem earned through its defamatory publication of *Obstruction of Justice*. We agree with Salem that this equitable remedy is not available for the defamation alleged in this case. We therefore reverse the denial of Salem's special motion to dismiss the unjust enrichment count.

## I. Background

Imran Awan was the first of appellees to work for the House of Representatives. While studying at Johns Hopkins University, he interned for an IT services firm that worked with House and Senate offices on Capitol Hill. He returned to the House to work as an IT professional in 2004 after graduation. Over time, Imran took on IT responsibilities for several House offices. When the amount

of work increased, he trained his brothers Abid and Jamal Awan, his wife Tina Alvi, and his close family friend Rao Abbas, to join him as "shared" IT employees serving multiple House offices at the same time as a team. Their job responsibilities included setting up and servicing technology for House offices, liaising with home district offices to troubleshoot issues, and purchasing equipment. The Awans did not have public-facing roles, did not interact with the press or constituents, and did not set House policies.

In 2016, the Chief Administrative Officer and Sergeant at Arms for the House of Representatives began investigating equipment procurement irregularities in the Awans' performance of their IT responsibilities. The investigation expanded after the Office of the Inspector General suspected that the Awans might have violated IT security requirements and House policies governing the use of "shared employees." The investigation eventually involved the United States Capitol Police and the Federal Bureau of Investigation.

On February 2, 2017, several media outlets broke the news that five unnamed IT employees for the House of Representatives were under investigation for procurement fraud and unauthorized access of House IT systems. Luke Rosiak reported on this story two days later, specifically naming several of the Awans as

the subjects of the investigation, in an article published by *The Daily Caller*, a news media organization co-founded in 2010 by former *Fox News* television host Tucker Carlson.  That article was the beginning of Rosiak's publication of a series of articles focusing on the investigation of appellees.

In July 2017, Capitol Police and FBI agents arrested Imran for making a misrepresentation on a home equity loan application.  The charge was unrelated to the Awans' work while employed at the House.  Imran had listed a rental property as his wife's primary residence, when it was really a property they rented to other people, in order to secure a line of credit.  Prosecutors also filed criminal charges against Alvi for the misrepresentation, but she was living in Pakistan at the time of Imran's arrest.

Press coverage of the investigations and Imran's arrest varied.  *The New York Times* noted that "[f]or months, conservative news outlets have built a case against" the Awans.  For example (as summarized in *Washington Post* and *New York Times* articles submitted by the parties), Sean Hannity and Geraldo Rivera discussed the investigations on a *Fox News* television show segment.  The articles report that Rivera said that Imran was a "corrupt I.T. guy" who "has all of the passcodes" and "has all of the information" and asked if he could have been the one who leaked the

Democratic National Committee's emails to WikiLeaks. In addition, YouTuber George Webb accused the Awans of being Pakistani spies and argued that the government was "orchestrating" the prosecution of Imran's loan misrepresentation to "look like there's a trial" when there was not.

President Trump spoke publicly about the supposed House IT scandal several times. He first reposted a tweet of an article with the headline "ABC, NBC, And CBS Pretty Much Bury IT Scandal Engulfing [Representative] Debbie Wasserman Schultz's Office." As reported in news articles included in the record, the President tweeted in April 2018 that the "Pakistani mystery man" held "Servers and Documents" and in June 2018 that the "Justice Department must not let Awan … off the hook." According to the Awans' complaint, in July 2018, President Trump also tweeted that the "Rigged Witch Hunt … should look into … the Pakistani Fraudster" and, on July 17, 2018, asked "[w]hat happened to the servers of the Pakistani gentleman that worked on the DNC?" while speaking at a joint press conference with Russian President Vladimir Putin about Russian interference with the 2016 U.S. presidential election.

Imran's attorneys responded to requests from the media for comment. They said he was innocent and claimed that "anti-Muslim bigotry" motivated public

accusations of criminal conduct. Most of their comments discussed only Imran, but his attorney's statements discussed the Awans as a group in one article. In a different article, Abid's attorney provided a statement regarding the allegations of espionage and procurement fraud, and Imran's attorney addressed the criminal charge related to the misrepresentation on the loan application pending against Alvi and her decision to travel to Pakistan with her children while she was under investigation but before she was charged with that crime.

Imran pleaded guilty in the United States District Court for the District of Columbia on July 3, 2018, to one count of making a false statement on a loan application in violation of 18 U.S.C. §1014. The government included a paragraph in his plea agreement publicly confirming that investigators had not found any evidence of criminal wrongdoing related to "public allegations that [Imran] stole U.S. House of Representatives … equipment and engaged in unauthorized or illegal conduct involving House computer systems." The paragraph stated as follows:

> The Government conducted a thorough investigation of those allegations, including interviewing approximately 40 witnesses; taking custody of the House Democratic Caucus server, along with other computers, hard drives, and electronic devices; examining those devices, including inspecting their physical condition and analyzing log-in and usage data; reviewing electronic communications between pertinent House employees; consulting with the House Office of General Counsel and

House information technology personnel to access and/or collect evidence; and questioning [Imran] during numerous voluntary interviews. The Government has uncovered no evidence that [Imran] violated federal law with respect to the House computer systems. Particularly, the Government has found no evidence that [Imran] illegally removed House data from the House network or from House Members' offices, stole the House Democratic Caucus Server, stole or destroyed House information technology equipment, or improperly accessed or transferred government information, including classified or sensitive information.

During Imran's sentencing on August 21, 2018, District Judge Chutkan commented that the paragraph in the plea agreement was "extraordinary." She added that "while the nature of the offense in this case is a felony and is serious, it is one that was brought to the government's attention based on its thorough investigation of unfounded allegations against Mr. Awan and his family." These allegations consisted, the judge said, of "baseless accusations" and "conspiracy theories linking Mr. Awan to the most nefarious kind of conduct, all of which have been accusations lobbed at him from the highest branches of government,… investigated and found to be untrue by the United States Department of Justice and the FBI." She concluded "that Mr. Awan and his family have suffered sufficiently." Imran was sentenced to time served and three months of supervised release. As part of Imran's plea agreement, the government agreed to request that the court dismiss

the charges against his wife. The government moved to dismiss the charges against Alvi during Imran's sentencing, and the court granted that motion.

The details of Imran's plea agreement were reported in the media, including the paragraph by prosecutors "publicly debunk[ing] conspiracy theories pushed by President Donald Trump and right-wing media," as one NBC News article characterized it. Imran gave an interview to *The Washington Post* on the day he signed the plea agreement. He told the *Post* about his Pakistani background, explained the harm that he had experienced, and said that the "[P]resident used [him] to advance his political agenda." In an interview with CNN, Imran's attorney said that Imran might seek a job in Silicon Valley. Imran was quoted as saying "I'm grateful to be here in this country and whatever it has given me. There's so much goodness here, and that should not get overshadowed."

Several months later, on January 29, 2019, Regnery Publishing, a division of Salem Media Group, Inc., published Luke Rosiak's book, *Obstruction of Justice*. In 311 pages, Rosiak chronicled what he said was "the product of years of investigative work … based upon hundreds of documents and dozens of interviews with individuals close to the [Awans] or otherwise knowledgeable of the events discussed within the book." The cover of the book displays Imran's photograph. *Obstruction*

*of Justice* was available for purchase in hard copy through Amazon and as an audiobook on Audible. In a foreword to the book, former Speaker of the House Newt Gingrich urged "[e]very American who is concerned about corruption in Washington [to] read Luke's book on what is possibly the largest scandal and coverup in the history of the United States House of Representatives."

The Awans dispute that characterization and argue that *Obstruction of Justice* is "riddled with outrageous, false, and defamatory attacks against the Awans, including but not limited to claims that they conspired to hack congressional servers, spied for foreign countries, and took advantage of their status as House employees to commit extortion, theft, and bribery." Rosiak continued to speak publicly about the Awans throughout 2019 as he promoted the book with appearances on commercial radio, television, and YouTube shows, making statements the Awans assert were "even more inflammatory and spurious than those in the book."

On January 28, 2020, the Awans sued *The Daily Caller*, Rosiak, and Salem in Superior Court for defamation, IIED, and unjust enrichment. The Awans filed an amended complaint on February 11, 2020. They sued Salem, specifically, for defamatory statements made in *Obstruction of Justice*. Their complaint identifies the following statements in the book as defaming one or more of them:

- "Representative Wasserman Schultz's IT aide [i.e., Imran] hacked the House," and "Imran was using his position to make 'unauthorized access' to House data."

- The "House had secretly caught the Awans hacking congressional servers a year ago, and there had been even more evidence of suspicious activity since."

- "Imran solicited a cash bribe from Taylor [a fellow IT staffer who asked to remain anonymous] in order to sell access to a Florida congresswoman's office."

- Imran was "caught … stealing the identity of an intelligence specialist, and sending electronic equipment to foreign officials."

- Imran said that "he was a 'mole' in Congress."

- Abid was "stealing cell phones" and "sending iPads and iPhones to government officials in Pakistan."

- The Awans were "stealing a couple hundred thousand in laptops" and "charged hundreds of thousands of dollars of equipment to congressional offices, sometimes delivered straight to their homes, but never took the invoices to chiefs of staff."

- Imran bragged about "how he used money he earned in Congress to pay police in Pakistan to torture his enemies," and "actually gave money to a police officer and said, 'Rape the guy. How many times you will rape him? I will pay you.'"

- Imran told fellow House IT contractors that, "I have these guys that work for the Faisalabad police department, and all we have to do is pay them $100 a month and they take [people] over to the police station, strip their clothes off, hang them upside down and beat them with a shoe."

In support of their IIED claim, the Awans alleged that Salem, Rosiak, and *The Daily Caller*'s conduct of "consistently publishing highly offensive and false assertions about the circumstances of the plaintiffs' employment and their character for years, long after they should have known the allegations were false and causing emotional distress and danger," amounted to extreme and outrageous conduct that has caused severe emotional distress.

Finally, the Awans asserted a claim of unjust enrichment to recover the profits earned from making defamatory statements "using the plaintiffs' names, personal information, and facts and circumstances" about their private lives.

On June 15, 2020, Salem and Rosiak filed special motions to dismiss the amended complaint pursuant to the Anti-SLAPP Act.[12] The trial court heard arguments on their special motions at the same time during a hearing on September 7, 2021. In a written opinion issued after the hearing, the court concluded that Salem and Rosiak made a prima facie showing that the Anti-SLAPP Act applied to the

---

[12] In addition, Rosiak and *The Daily Caller* moved to dismiss certain claims as untimely. On July 27, 2021, the court dismissed claims against them arising outside the one-year statute of limitations. (The court did not dismiss claims arising from publications after January 28, 2019.) *The Daily Caller* is no longer a party to this litigation as the result of the dismissal of all claims against it.

Awans' claims. Specifically, the court said, the claims arose out of Salem's publication of Rosiak's book, which was distributed "in the public forum on an issue of public interest." The "issue of public interest," according to the trial court, was "a national security investigation in the United States House of Representatives." The burden then shifted to the Awans to demonstrate a likelihood of success on the merits.

First, the court found that the Awans were likely to succeed on all elements of their defamation claim. As to the fault standard upon which to judge the publication of the defamatory statements, the court concluded that while the controversy "is clearly of public concern," the Awans were not public figures; they were "private citizens who were involuntarily thrust into the controversy." The court said that the Awans "did not bring themselves to the forefront of this issue in order to influence the resolution of the issues involved" and "did not deliberately attempt to influence the outcome of the issue outside of bringing this lawsuit."[13] "[W]orking as information technology specialists for members of Congress," the court added, "does not automatically give them status as public figures, as their roles were solely outside of the public eye." Because the court concluded that the Awans were private

---

[13] (Citing *Wolston v. Reader's Dig. Ass'n*, 443 U.S. 157 (1979)).

figures, it found it unnecessary to determine whether they were likely to succeed in establishing that the defendants published with actual malice.

Next, the court found that the Awans were likely to succeed on their IIED claim because Rosiak's statements, including those published in *Obstruction of Justice*, were extreme and outrageous, and they caused severe emotional distress as evidenced by the declarations the Awans submitted. Finally, the court said that the "claims for unjust enrichment stem from Defendants' alleged revenue and profits obtained by publishing the alleged defamatory allegations" about the Awans. Since "a properly instructed jury could look at the totality of the circumstances regarding the defamation claims and unjust enrichment claims and find for Plaintiffs," the court found that the Awans showed a likelihood of success. Thus, the court denied the special motions to dismiss, concluding that, based on the evidence proffered, a jury properly instructed on the law could reasonably find that all of the Awans' claims are supported.

Both Salem and Rosiak appealed the court's denial of their Anti-SLAPP motions to dismiss and we consolidated those appeals. However, prior to oral argument in this case, Rosiak moved for voluntary dismissal of his appeal pursuant

to D.C. App. R. 13(b), which we granted.[14]  This opinion thus is limited to Salem's appeal of the trial court's order denying its special motion to dismiss.  We review de novo "whether a jury properly instructed on the applicable legal and constitutional standards could reasonably find that the claim is supported" based on the evidence proffered.[15]  We begin with the defamation claim.

## II. Defamation

The Awans sued Salem for allegedly defamatory statements that it published in *Obstruction of Justice*.  To successfully bring a claim for defamation, the plaintiff must prove:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party;

---

[14] *Rosiak v. Awan*, No. 21-CV-0893, Order (D.C. Mar. 27, 2023).

[15] *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1232 (D.C. 2016); *see id.* at 1240.

(3) that the defendant's fault in publishing the statement [met the requisite standard]; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.[16]

The trial court concluded that the Awans satisfied their burden on all four elements.

Salem's argument is limited to the third element; it argues that the trial court evaluated the claim under the wrong fault standard. The applicable fault standard "turns upon whether the plaintiff is a public or a private figure."[17] If the plaintiff is a private figure, then negligence is the applicable fault standard.[18] But if the plaintiff is a public figure, then (at least if the defamatory statement pertains in some way to that status) the plaintiff must demonstrate by clear and convincing evidence that the defamatory statement was made with "actual malice," i.e., "with knowledge that it was false or with reckless disregard of whether it was false or not."[19]    As we

---

[16] *Id.* at 1240 (first alteration in original) (footnote omitted) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).

[17] *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. 2020).

[18] *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980).

[19] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280, 285-86 (1964); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *Beeton v. District of Columbia*, 779 A.2d 918, 924 (D.C. 2001).

emphasized in *Mann*, this is a significantly more demanding standard than negligence: "Knowledge" means the defendant "actually knew that the statement was false," a state of mind we have referred to as "subjective knowledge."[20] "Reckless disregard" does not require such actual knowledge, but it requires a showing that "the defendant in fact entertained serious doubts as to the truth of [the] publication."[21]

## A. The Actual Malice Standard

Erroneous statements that may be harmful to the subject's reputation are "inevitable in free debate."[22] Conditioning liability for defamation in the course of public discourse on proof of actual malice is meant to ensure that "the freedoms of expression" protected by the First Amendment "have the 'breathing space'" necessary to survive.[23] In *New York Times Co. v. Sullivan*, the Supreme Court concluded that the "profound national commitment to the principle that debate on

---

[20] *Mann*, 150 A.3d at 1252.

[21] *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

[22] *New York Times Co.*, 376 U.S. at 271.

[23] *Id.* at 271-72 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

public issues should be uninhibited, robust, and wide-open" required the actual malice standard to apply to a defamation suit brought by a public official for statements that related to his official conduct.[24]  The Court later expanded the rule that there be proof of defamation with actual malice to suits brought by other "public figures,"[25] as we explain below.

The balance of interests did not lead to the same result for plaintiffs deemed to be "private" figures.  In *Gertz v. Robert Welch, Inc.*, a private attorney who represented the family of a young man killed by a police officer sued for defamation based on statements a magazine published about him.[26]  The Supreme Court concluded that, as the attorney was a private individual rather than a public figure, the actual malice standard did not apply to the attorney's claim, and that states "should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual" for two reasons.[27]  First, private individuals are "more vulnerable to injury," so the "state

---

[24] *Id.* at 270, 279-80.

[25] *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967).

[26] 418 U.S. 323, 325-27 (1974).

[27] *Id.* at 345-46.

interest in protecting them is correspondingly greater."[28]  That is so because the first remedy for a victim of defamation is to use "available opportunities" to correct the lies and misstatements.[29]  Public officials and public figures enjoy "significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."[30]  Second, and "[m]ore important" than the access to self-help remedies, is that an "individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs," and thereby "runs the risk of closer public scrutiny than might otherwise be the case."[31]  While media can "act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood," private individuals have not, and are therefore "more deserving of recovery."[32]

With these principles in mind, the Court identified three types of defamation plaintiffs who must prove the defendant defamed them with actual malice: (1) a

---

[28] *Id.* at 344.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 345.

public official; (2) an individual who "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," referred to as a general-purpose public figure; and (3) "[m]ore commonly, an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues," i.e., a limited-purpose public figure.[33]

Salem argues that the Awans are limited-purpose public figures, either by virtue of their own voluntary actions or involuntarily in view of their prominence in the public controversy at issue. "Because of the constitutional dimensions of the issue," whether an individual is a public figure and "subject to the *New York Times* standard is a question of law to be resolved by the court."[34] On reviewing the denial of an Anti-SLAPP motion to dismiss, we therefore consider whether the record supports the court's conclusion that the Awans maintained their status as private individuals.[35] We utilize the framework set forth in *Waldbaum v. Fairchild*

---

[33] *Id.* at 351.

[34] *Moss v. Stockard*, 580 A.2d 1011, 1029 (D.C. 1990).

[35] *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016).

*Publications, Inc.*,[36] which we have said offers a "road map" for applying the Supreme Court's precedent in this area of law.[37] Initially, we must identify whether there was a public controversy in existence and, if so, determine its scope.[38] If there was a preexisting public controversy, we must determine whether the plaintiff is a private or public figure and whether the defamatory statements were "germane to the plaintiff's participation in the controversy."[39]

## B. The Existence of a Public Controversy

"A public controversy is 'not simply a matter of interest to the public … [but] a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way…. [It] is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'"[40]

---

[36] 627 F.2d 1287 (D.C. Cir. 1980).

[37] *Moss*, 580 A.2d at 1030.

[38] *Id.* at 1031.

[39] *Id.* ("Defamatory statements wholly unrelated to the controversy do not merit New York Times protection.").

[40] *Id.* at 1030-31 (quoting *Waldbaum*, 627 F.2d at 1296).

Importantly, "the controversy to which the defamation relates [must have been] the subject of public discussion prior to the defamation."[41]

Salem has characterized the public controversy as "the House IT scandal — involving intersecting issues of alleged procurement fraud, Congressional network security and national security." The trial court did not specifically define the public controversy in finding that one existed under the *Waldbaum* framework. We think Salem's assertion and particular framing of the public controversy in issue in this case to be somewhat inaccurate and problematic. The record indicates there was a full investigation of (comparatively minor) irregularities in the performance of IT services for House members; irregularities that did raise potential concerns and that were taken with appropriate seriousness by the investigators, but that ultimately did not give rise to charges or findings of procurement fraud or endangerment of Congressional or national security. (In fact, the investigation ended in something of an exoneration.) This investigation was a matter of public interest and concern, but as has been said, not every matter of public interest and concern is a matter of public "controversy." To be sure, when the existence of the investigation became public, there were efforts in some media to identify a "scandal" and raise questions of

---

[41] *Id.* at 1030.

serious wrongdoing on the part of the Awans (while others were more cautious and awaited the outcome of the inquiry under way before embracing any conclusions). But it thus is questionable whether public discussion of the asserted controversy actually preceded the commencement of the defamatory statements about the Awans that led to this lawsuit; the publication of those statements may have begun whatever controversy there was. Despite the foregoing caveats, however, for present purposes we shall accept that there was a genuine public controversy over the investigation and what it might have uncovered. We accept the trial court's conclusion that it had the "two components" of a public controversy because (1) "the controversy to which the defamation relates was the subject of public discussion" in 2017 and thus prior to the allegedly defamatory statements Salem published in January 2019, and (2) "a reasonable person would [or, at least, *could*] have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution."[42]

We turn, therefore, to consider whether the Awans became public figures by voluntarily and purposely injecting themselves into the controversy, or involuntarily.

---

[42] *Id.*

### C. Voluntary Limited-Purpose Public Figures

Salem argues that the Awans became voluntary limited-purpose public figures by assuming special prominence in the controversy through their "ready access" to mass media in order "to influence policy and to counter criticism of their views and activities."[43] Salem points to the media coverage of the criminal and administrative investigations; statements the Awans and their attorneys gave concerning the alleged House IT scandal to the media; the "sympathetic treatment" the Awans received in the "mainstream press"; and public defenses offered on their behalf by their "congressional bosses."

To determine whether someone is a voluntary limited-purpose public figure, we look to "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."[44]  The plaintiff "must have achieved a special prominence *in the debate*, and either 'must have been purposely trying to

---

[43] *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. 2020).

[44] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974).

influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution.'"[45] Although individuals with "significantly greater access to the channels of effective communication"[46] have one of the characteristics that is typically associated with a public figure, mere prominence combined with having some access to the media is insufficient.[47] It is the "regular and continuing access to the media that is one of the

---

[45] *Moss*, 580 A.2d 1011, 1031 (D.C. 1990) (emphasis added; quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)); *cf. id.* ("If '[the plaintiff] is shaping or is trying to shape the outcome of a particular public controversy, he is a public figure for that controversy; if not, he remains a private individual.'" (quoting *Waldbaum*, 627 F.2d at 1298 n.32)); *see also Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 583 (D.C. 2022) (applying the standards from defamation law to D.C. Code §16-5501(3) to determine whether the defendant demonstrated that the plaintiff was a "public figure" under the Anti-SLAPP Act).

[46] *Gertz*, 418 U.S. at 344.

[47] In *Time, Inc. v. Firestone*, for example, the Supreme Court held that the plaintiff, a prominent member of "Palm Beach society," did not become a public figure limited to the controversy surrounding her divorce by virtue of her decision to hold a few press conferences "to satisfy inquiring reporters." 424 U.S. 448, 453, 454 & n.3 (1976).

accouterments of having become a public figure."[48]  In other words, "[t]rivial or tangential participation is not enough."[49]

Moreover, engagement with the media simply in order to respond to defamatory statements is not enough either.[50]  "[I]f the content of a defamatory statement touches upon an area that state law has traditionally considered to be defamatory per se, then the plaintiff cannot be categorized as a limited-purpose public figure solely because he makes reasonable public replies to the statement."[51] And in *Wolston v. Reader's Digest Association* the Supreme Court rejected the notion "that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his

---

[48] *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979); *see also Doe No. 1 v. Burke*, 91 A.3d 1031, 1043 (D.C. 2014) (concluding that an attorney was a limited-purpose public figure because she sought out publicity on behalf of her client that was so substantial it prompted a defendant in one of her previous cases to seek a gag order against her).

[49] *Waldbaum*, 627 F.2d at 1297.

[50] *Hutchinson*, 443 U.S. at 136 (recognizing that while the plaintiff, a research behavior scientist who accepted federal research awards, had access to the media to respond to the fake award he received by one Congress member who believed he wasted public funds, he was not a public figure).

[51] *Wells v. Liddy*, 186 F.3d 505, 534 (4th Cir. 1999).

conviction."[52]  Ilya Wolston had failed to respond to a grand jury subpoena issued in connection with an investigation of Soviet intelligence agents in the United States, and the media covered his criminal contempt proceeding.[53]  The Court held that Wolston's failure to respond to the subpoena was not a "voluntary action" that was "calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue."[54]  Rather, Wolston "limited his involvement to that necessary to defend himself against the contempt charge."[55]  His conduct did not make him a limited-purpose public figure.[56]

---

[52] 443 U.S. 157, 168 (1979).

[53] *Id.* at 161-63.

[54] *Id.* at 165, 168.

[55] *Id.* at 167.

[56] *See id.* at 167-68.  For essentially the same reason, we reject Salem's argument that the Awans should have expected that the media would discuss the administrative investigations into their violations of House policies, so (like public figures) they assumed the risk of being defamed.  If someone "who engages in criminal conduct" will not "automatically become[] a public figure," *id.* at 168, then someone who is subject to internal administrative investigations and correspondingly less significant consequences should be viewed in the same way. That such conduct will not make someone a public figure is even more appropriate in this case because the conduct giving rise to the administrative investigation is the very same as what sparked the criminal investigations.

Thus, we must focus on the nature and extent of the Awans' participation in the asserted public controversy.[57] The media coverage started after the House investigation began and continued through the time after Salem published *Obstruction of Justice*. Among the many articles covering the controversy that Salem cites, there are a handful of articles demonstrating that Imran's attorneys responded to press inquiries. His attorneys' comments expressed their assertion of his innocence, offered additional context to the allegations, and addressed the public allegations, which could only be explained, in their view, as stemming from political motivations and anti-Muslim bigotry. Imran himself provided an interview to *The Washington Post* — with "his first public statements since the investigation began," according to the *Post* — on July 3, 2018, the same day he entered his plea agreement in the prosecution for his misrepresentation on a loan application. Imran said that he believed his prosecution was politically motivated because of his Pakistani background and that it had "cost me my reputation, my livelihood, my family." In his only other interview in the record before us, Imran reflected on being "grateful to be here in this country" after his sentencing.

---

[57] Salem does not argue that the Awans had control over the news reporters or comments from members of Congress who defended the Awans. We thus focus on the voluntary statements that the Awans themselves or their representatives made.

The number of comments about Abid, Jamal, Alvi, or Abbas given to the press is even sparser; the statements consisted of a few sentences related to the accusations of criminal conduct. Abid's attorney specifically defended Abid in context of the allegations of espionage and procurement fraud, stating that "what they were doing was not unusual" in the House, and that "[i]n a fluid situation you do what you're ordered to do," so missing equipment "disappeared after it was brought to the folks who were demanding it." Imran's attorney specifically mentioned Alvi in regards to the pending criminal charge of her misrepresentation on the loan application and her decision to return to Pakistan before the investigation came to a resolution. The attorney said that she and Imran repaid the loan from their retirement funds, and explained that she left the United States so that they could rent their home as a source of income and to "'escape the media frenzy,' which had included 'harassment'" directed towards their children.

These brief comments providing Imran's or another family member's side of the story in response to press inquiries are not sufficient to make the Awans voluntary limited-purpose public figures. There is no evidence before this court that Imran or the Awans' attorneys provided comments to the press until *after* all members of the group were under criminal investigations and Imran and Alvi faced criminal charges. "There appears little reason why these individuals should

substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom."[58]

Some of Imran and his attorneys' comments expressed concern about anti-Muslim bias and political motivations, which perhaps could be considered indicative of an effort to influence broader issues of public concern or to ferret out bias in the criminal investigation to influence its outcome.[59] However, Imran's background became tied to the controversy before he made comments about this topic, and his responses were appropriately limited. The media reported that members of Congress referenced his Pakistani background and fears of anti-Muslim bias in the investigation long before Imran and his attorneys did. Simultaneously, reports in the media suggested that Imran was spying on the U.S. on behalf of Pakistan. The Awans cite multiple instances in which President Trump either publicly referred to someone named "Awan" or someone connected to the House IT scandal with reference to that person's Pakistani background, using phrases such as the "Pakistani mystery man" and "Pakistani fraudster." In another context, Imran and his

---

[58] *See Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976).

[59] *Cf. Wolston*, 443 U.S. at 168 ("[T]his is not a case where a defendant invites a citation for contempt in order to use the contempt citation as a fulcrum to create public discussion about the methods being used in connection with an investigation or prosecution.").

attorneys' comments could be viewed as an attempt to broadly influence public debate about matters of public controversy. But in light of the existing narrative, while their comments still touch on matters of public concern, they were limited to defending the Awans related to the investigations into their work for the House.

This media access did not rise to longstanding and widespread access like that of the plaintiffs in *Fridman v. Orbis Business Intelligence Ltd.*,[60] the case on which Salem primarily relies. There, this court concluded that three Russian business figures "assumed special prominence in the controversy" involving the "Russian government and its activities and relations around the world, including the United States," because of their access to mass media.[61] The record included "hundreds of pages of news articles" about the three plaintiffs related to the public controversy, "thousands of internet search hits for each" individual, and "personal interviews" that "spanned a wide range of subjects."[62] Notably, the plaintiffs had previously been deemed public figures and evidence of their continuing access to the media in

---

[60] 229 A.3d 494 (D.C. 2020).

[61] *See id.* at 507, 509 (alterations omitted).

[62] *Id.* at 508.

the fifteen years since provided a sufficient basis to conclude that their public figure status had not subsided.[63]

Salem argues that even if the Awans were not public figures in February 2017 when press coverage first began, the "media comment" about them made them public figures by the time that Salem published the allegedly defamatory statements in January 2019. But "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."[64] That reasoning applies to Salem's conduct even though Salem was not the first to publish statements about the Awans. Publishers cannot rely on other people's defamation to claim a change in the plaintiff's status. Nor are publishers who come along after those who first cover the same story entitled to greater protection from liability.

Salem also argues that the Awans assumed the risk of injury through their "work in politics," including their conduct while employed by the House of Representatives. But it is inaccurate to say that the Awans worked in politics. They were not politicians or political staffers, and they did not fulfill public-facing roles

---

[63] *See id.* at 507 n.5.

[64] *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).

or make public policy. Nor was their position accompanied by an understanding that they could influence others' views.[65] Even though the Awans worked for the government, it was only in subordinate, non-political service positions. If those positions gave them some access to politicians or political information, they had that in common with a great many other non-political government employees who perform services to enable the government to function. This was not enough to make the Awans "public figures." To hold otherwise would effectively contravene the Supreme Court's admonition that public officials "cannot be thought to include all public employees."[66]

---

[65] *Cf., e.g.*, *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 584 (D.C. 2022) (concluding that the interim president for a national union was a limited-purpose public figure because of "his role as a high-level union representative who frequently spoke in the press," which "suggests an intent and capacity to influence the outcome of the debate surrounding all manner of labor concerns"); *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1299-1300 (D.C. Cir. 1980) (concluding the plaintiff was a limited-purpose public figure because he was an "executive within a prominent and influential company" who used his position to be the "mover and shaper of many of the cooperative's controversial actions" such that he "became an activist, projecting his own image and that of the cooperative far beyond the dollars and cents aspects of marketing").

[66] *Hutchinson*, 443 U.S. at 119 n.8; *see id.* at 135 (rejecting that "everyone who received or benefited from the myriad public grants for research could be classified as a public figure"); *see also Moss v. Stockard*, 580 A.2d 1011, 1032 n.37 (D.C. 1990) ("The constitutional defamation cases strike a careful balance between this societal interest and the states' interest in affording a remedy for reputational injury. . . . [T]o expose anyone handling public funds to defamatory charges of

We conclude that the Awans did not voluntarily engage in the controversy giving rise to this defamation case so as to become voluntary limited-purpose public figures.

## D. Involuntary Public Figures

Salem argues that even if the Awans are not voluntary public figures, they qualify as "involuntary" public figures. The concept of involuntary public figures stems from the Supreme Court's unelaborated comment in *Gertz* that "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own."[67] The Court considered this a possibility only in "exceedingly rare" situations.[68] "Simply being the subject of discussion is not enough"[69] because a "private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts

---

misappropriation, would give the rule an inappropriately broad compass without reference to that balance of interests").

[67] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

[68] *Id.*

[69] *Moss*, 580 A.2d at 1031 n.35.

public attention."[70]  The Supreme Court has not had occasion since *Gertz* to provide further guidance on what it takes to become a public figure involuntarily, and courts and commentators have struggled with the concept and found it elusive and confusing; some even have expressed doubt as to its actual existence.[71]  This court has acknowledged the existence of this category of public figures,[72] but we have never applied it to a particular plaintiff.  In weighing the "exceedingly rare" necessity of making a private individual an involuntary public figure, it is important to remember the "high price" that imposing the actual malice standard associated with public figure status "exacts" from victims of defamation, and that there is not

---

[70] *See Wolston v. Reader's Dig. Ass'n*, 443 U.S. 157, 167 (1979); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 456 (1976) (reaffirming that "subject-matter classifications," such as whether something is an issue of public concern, do not "determine the extent of constitutional protection afforded defamatory falsehoods").

[71] *See, e.g., Nunes v. Lizza*, 486 F. Supp. 3d 1267, 1295 (N.D. Iowa 2020) (commenting that subsequent Supreme Court decisions "appeared to suggest" that involuntary public figures are not only "hypothetical, but perhaps mythical," and that some lower courts "have rejected [the] idea that the involuntary public figure exists any more than Bigfoot or the Loch Ness Monster") (citing cases)). For a comprehensive overview of the issues, *see* W. Wat Hopkins, *The Involuntary Public Figure:  Not So Dead After All*, 21 Cardozo Arts & Ent. L.J. 1 (2003).

[72] *See, e.g.*, *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 505 (D.C. 2020) ("Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome.").

liability without some showing of fault even for private defamation plaintiffs.[73]  We therefore must be reluctant to adopt too broad a definition of the perhaps "hypothetical" involuntary public figure; we must be mindful that public figure status normatively is limited to those who in some way have earned it by their own choices:

> For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.[74]

In determining whether the Awans should be held to be involuntary public figures, we find further guidance in decisions of the California Supreme Court and

---

[73] *See Gertz*, 418 U.S. at 342, 347 (explaining that the actual malice "standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander" but also "exacts a correspondingly high price from the victims of defamatory falsehood" such that states may define the standard of liability for injury to private individuals "so long as they do not impose liability without fault").

[74] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

the United States Court of Appeals for the Fourth Circuit. The California Supreme

Court has said:

> We infer from the logic of *Gertz* that the high court would reserve this characterization [of an involuntary public figure] for an individual who, despite never having *voluntarily* engaged the public's attention in an attempt to influence the outcome of a public controversy, nonetheless has acquired such public prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements."[75]

The Fourth Circuit has articulated the following two-part test for delimiting

the category of involuntary public figure:

> First, to prove that a plaintiff is an involuntary public figure the defendant must demonstrate to the court that the plaintiff has become a central figure in a significant public controversy and that the allegedly defamatory statement has arisen in the course of discourse regarding the public matter. To prove that the plaintiff is a central figure in the controversy, the defendant must put forth evidence that the plaintiff has been the regular focus of media reports on the controversy. A significant public controversy is one that touches upon serious issues relating to, for example, community values, historical events, governmental or political activity, arts, education, or public safety. Second, although an involuntary public figure need not have sought to publicize her views on the relevant controversy, she must have nonetheless assumed the risk of publicity. Therefore, the defendant must demonstrate that the

---

[75] *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 702 (Cal. 1998).

> plaintiff has taken some action, or failed to act when action was required, in circumstances in which a reasonable person would understand that publicity would likely inhere.[76]

Salem urges us to follow the D.C. Circuit's arguably somewhat less restrictive approach to the involuntary public figure question in *Dameron v. Washington Magazine, Inc.*[77] In that case, Merle Dameron "by sheer bad luck" had been the only air-traffic controller working at Dulles Airport at the time of a plane crash resulting in great loss of life.[78] Dameron claimed he was defamed by a magazine article that falsely said the controller on duty had been "assigned partial blame" for the accident. The court held that Dameron had become an involuntary public figure "for the very limited purpose of discussions of the … crash."[79] It reasoned that Dameron "was at the center of a controversy involving the loss of many lives in a mishap involving a public carrier," and that he had become "well known" to the public and acquired a special prominence and "public notoriety" in this limited connection after testifying for hours about his role in the highly publicized hearing before the agency

---

[76] *Wells v. Liddy*, 186 F.3d 505, 539-40 (4th Cir. 1999).

[77] 779 F.2d 736 (D.C. Cir. 1985).

[78] *Id.* at 738, 741.

[79] *Id.* at 743.

investigating the plane crash.[80]   Acknowledging that Dameron had become "embroiled" in the public controversy over the cause of the crash "through no desire of his own,"[81] the court "pause[d] to emphasize" what it said was "the limited scope" of its holding."[82] The court added that it was "confident" that "[t]he circumstances in which an involuntary public figure is created will . . . continue to be few and far between."[83]

We think the foregoing cases counsel against a finding that the Awans were involuntary public figures with respect to any public controversy.   If the circumstances of this rather garden-variety case of a government investigation of procurement irregularities sufficed to render the Awans involuntary public figures, then what the Supreme Court hypothesized as an "exceedingly rare" status will become anything but rare.   The Awans were obscure individuals with a small IT business who did not acquire what the California Supreme Court called "such public prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements."   We doubt that the

---

[80] *Id.* at 742.

[81] *Id.*

[82] *Id.* at 743.

[83] *Id.*

controversy concerning their IT services to a few House members rose to the level of significance envisioned by the Fourth Circuit's test (notwithstanding that some of members the Awans served were themselves prominent), and Salem has not shown that the Awans "[took] some action, or failed to act when action was required, in circumstances in which a reasonable person would understand that publicity would likely inhere."

As for *Dameron*, we have reservations about its analysis, which seems in tension with *Gertz* and with *Wolston*'s statement that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."[84] In any event, the circumstances of public interest in the present case differ materially from those in *Dameron*, and the Awans' involvement in those circumstances was not so central that we must recognize them as involuntary public figures to protect the freedoms of expression in the First Amendment. For one, it is telling that an effort to revise the House's policies governing shared employees and procurement, which triggered the House IT controversy, did not involve the Awans directly. The topic was freely discussed in a Committee on House Administration hearing called "Examining the

---

[84] 443 U.S. at 167.

Role of Shared Employees in the House" on April 12, 2018. Testimony alluded to the investigation of the Awans' conduct but without reference to their names or characteristics. Unlike in *Dameron*, the Awans were not called to testify publicly about their role in the controversy even after the criminal investigation ended. In addition, Salem has not presented evidence that the public's identification or recognition of the Awans in connection with the inquiry into compliance with House policies reached the same level as the identification in *Dameron*.

The Supreme Court in *Gertz v. Robert Welch, Inc.* balanced the state's interest in providing redress for reputational harm of private individuals against "vigorous and uninhibited press" protected by the First Amendment.[85] The Court concluded that applying the actual malice standard to private individuals would "abridge [the] legitimate state interest to a degree that" the Court found "unacceptable."[86] Instead, what the Court called the "more equitable boundary" allows recovery for defamation so long as the publisher is not held liable *solely* based on the inclusion in its publication of a false statement, i.e., without regard to fault.[87] In this case, requiring

---

[85] 418 U.S. 323, 342, 347-48 (1974).

[86] *Id.* at 346.

[87] *See id.* at 347-48.

the Awans to prove that Salem negligently published false statements in *Obstruction of Justice* (rather than requiring a showing of greater fault, i.e., actual malice), adequately achieves the proper balance.

For the above reasons, we affirm the trial court's conclusion that the Awans are not limited-purpose public figures and affirm the denial of the special motion to dismiss the defamation claim.[88]

### III. Intentional Infliction of Emotional Distress

We turn now to the Awans' IIED claim. "To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show '(1) extreme and

---

[88] Because we conclude that the Awans are not public figures, we do not address Salem's argument that the Awans cannot demonstrate actual malice. We also need not address whether the evidence is sufficient for a jury to find the claim supported by the evidence proffered because Salem has not argued that the Awans could not meet their burden if the negligence standard applies.

outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'"[89]  The trial court found that a properly instructed jury could reasonably find that the claim was supported by the evidence proffered.  Specifically, the court said that "the statements made by Defendant Luke Rosiak … in his book, published by Defendant Salem Media Group, Inc.," rose "to the level of extreme and outrageous conduct" and that such "conduct intentionally or recklessly caused Plaintiffs severe emotional distress."

Salem argues that the trial court erred because the Awans cannot demonstrate the elements of IIED.  We agree that the Awans have not shown that Salem's conduct was "extreme and outrageous."  "Extreme and outrageous conduct" is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[90]

The Awans describe the "extreme and outrageous" conduct in this case as the "multi-year campaign of disseminating false narratives and conspiracies that appeal

---

[89] *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016) (quoting *Williams v. District of Columbia*, 9 A.3d 484, 493-94 (D.C. 2010)).

[90] *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.10 (D.C. 1994) (quoting Restatement (Second) of Torts §46 cmt. d (Am. L. Inst. 1965)).

to xenophobic and Islamophobic stereotypes — a coordinated attack that has unleashed an onslaught of negative media coverage, harassment, and threats trained on the plaintiffs." That may be a fair characterization if we throw Rosiak and *The Daily Caller*'s allegedly tortious conduct from the period prior to Salem's publication of the book into the mix, but we are not aware of any evidence to indicate that Salem "coordinated" with them during or after that time.[91] The only conduct properly attributable to Salem is its publication of *Obstruction of Justice*.

The question of "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery" requires a demanding showing that is a threshold question for the court.[92] This court has weighed "the advantage to society of preventing [the alleged] harm" against the "chilling effect of

---

[91] *Cf. King v. Kidd*, 640 A.2d 656, 674-75 (D.C. 1993) (satisfying the elements of IIED where the plaintiff's supervisor colluded with the person the plaintiff accused of sexual harassment to retaliate against the plaintiff for filing a complaint and to cover up the wrongdoing).

[92] *Drejza*, 650 A.2d at 1316; *see id.* at 1312; *see also King*, 640 A.2d at 668 (determining what is extreme and outrageous by looking to "community standards of offensiveness and decency" and "the specific context in which the conduct took place," including "the nature of the activity at issue, the relationship between the parties, and the particular environment in which the conduct took place").

imposing liability."[93] We must be especially attentive to the potential chilling effect where the claim is based on pure speech relating to a matter of legitimate public interest. This court has been cautious in the past when urged to impose liability based on IIED for such speech even if it is deeply upsetting to its subjects. For example, we held that the conduct of persons who stood on the street outside the plaintiff's home loudly "chanting slogans" and "vague threats" of future injury was not extreme and outrageous.[94] We said that although "serious threats" would have led to a different result, the conduct was "part and parcel 'of the frictions and irritations and clashing of temperaments incident to participation in a community life,' especially life in a society that recognizes a right to public political protest."[95] Similarly, public discussion of truthful statements that divulge personal details will not necessarily be extreme and outrageous. For instance, an attorney was held not

---

[93] *Waldon v. Covington*, 415 A.2d 1070, 1078 (D.C. 1980) (citing *Clark v. Associated Retail Credit Men of Wash., D.C.*, 105 F.2d 62, 65 (D.C. Cir. 1939)); *see also* Restatement (Third) of Torts: Phys. & Emot. Harm §46 cmt. c (Am. L. Inst. 2012) ("[A] court may decide that an identified and articulated policy is weighty enough to preclude liability. Thus, a court may decide that although the First Amendment does not bar liability, the protection of speech is nonetheless a weighty enough concern in a given context that liability for intentionally inflicted emotional harm should not be imposed.").

[94] *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163-64 (D.C. 2013).

[95] *Id.* (citation omitted).

liable for discussing the sexual harassment that led to employment retaliation against her clients, including sharing the full name of the employee who was harassed on a public blog and the video depicting the incident on YouTube and local television stations.[96] This court has also concluded that a police press release mistakenly accusing someone of being the culprit of a widely-discussed murder, even where the evidence against the person had immediately been called into question, is not extreme and outrageous.[97]

Calling pure speech about an issue of public concern "extreme and outrageous" conduct is clearly reserved for the rarest of cases. It is undisputed that *Obstruction of Justice* is speech about potentially serious matters that were the subject of public controversy and concern. In light of the high bar for these types of IIED claims, we conclude that the Awans have not identified features of Salem's conduct in publishing the book sufficiently atrocious to satisfy the elements of IIED.

---

[96] *See Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1265, 1269 (D.C. 2015).

[97] *Minch v. District of Columbia*, 952 A.2d 929, 935-36, 940-41 (D.C. 2008) (finding the elements of IIED not satisfied where police publicized their arrest of a college student for murdering his classmate even though the prosecutor dropped the charges shortly after the arrest for lack of probable cause and someone else later admitted to the murder).

The Awans do not contend that Salem gratuitously and spitefully publicized highly personal and embarrassing information about them; nor do they claim that Salem was motivated to endanger their wellbeing or cause them economic injury.[98] We do not dismiss the Awans' claims that Salem's libelous publication indeed added to the reputational harm and emotional distress that they suffered. The contents of *Obstruction of Justice* may have been false, defamatory, and actually detrimental to the Awans, but actionable defamation alone is not enough to amount to IIED. That Salem may have committed the tort of defamation does not mean it engaged in extreme and outrageous conduct with the specific intent to inflict emotional distress or threaten their wellbeing; nor that Salem maliciously sought to cause them to suffer unwarranted harassment or to spark an unjustified reopening of the government's investigations of their activities (which were resolved months before the publication of *Obstruction of Justice*). In sum, where the Awans have not raised the foregoing concerns, we cannot say that Salem's publication of non-threatening public speech

---

[98] *Cf. Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1042 (D.C. 2015) (concluding that an ex-husband's publication of a civil complaint against his ex-wife's romantic partner could be extreme and outrageous given the "particularly sexually explicit language of the complaint" and its goal to trigger an investigation by the plaintiff's professional governing bodies and to "brand" the plaintiff with "scarlet letter").

crossed the threshold to meet the elements of IIED.[99]  And even if proven, such aggravated and malicious conduct can be fully compensated through a defamation claim.[100]  We therefore reverse the trial court's ruling with respect to the IIED cause of action.

## IV. Unjust Enrichment

The Awans claim that Salem financially benefited "by publishing false and defamatory statements using the plaintiffs' names, personal information, and facts and circumstances of the plaintiffs' private lives."  They seek disgorgement of the profits from *Obstruction of Justice* to reverse Salem's unjust enrichment by such

---

[99] Salem also argued that the trial court's finding that its publication of *Obstruction of Justice* amounted to extreme and outrageous conduct violates the First Amendment.  Because we conclude that the Awans' claim failed to satisfy the elements of IIED, we do not address its constitutional argument.

[100] We note that if the Awans establish that Salem defamed them with actual malice, the Constitution permits the imposition of punitive damages.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

means.  This court recognizes unjust enrichment when "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."[101]  The trial court concluded that "a properly instructed jury could look at the totality of the circumstances regarding the defamation claims and unjust enrichment claims and find for Plaintiffs."  We disagree and reverse.

Unjust enrichment and restitution do not properly apply to the claims asserted in this case.  Other courts have rejected similar claims brought by defamation plaintiffs because the plaintiff never conferred a benefit on the defendant in the way that unjust enrichment claims typically require.  For instance, the U.S. Court of Appeals for the Eighth Circuit did not permit the plaintiff, who was the subject of a portion of a book, to seek disgorgement of the profits from the book's sales because the plaintiff did not confer a benefit on the author through the plaintiff's "mere existence as a colorful figure who might inspire people to make up stories about him."[102]  Similarly, courts have said that defamation plaintiffs may not seek

---

[101] *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).

[102] *See, e.g.*, *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016); *see also Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 126 (Del. Ch. 2017) ("[T]he remedy of disgorgement appears sufficiently disconnected from the tort of

disgorgement for advertising and revenue profits gained by platforms that shared a defamatory article because the plaintiff would be "attempting to obtain an additional remedy that bears no relation to the injury" suffered and because the plaintiff would not otherwise be entitled to receive a portion of the advertising revenues.[103]

Like the plaintiffs in those cases, the Awans did not "confer a benefit" on Salem that would provide a basis for unjust enrichment. And the harm the Awans allege is Salem's defamation of them — not that Salem failed to compensate them for publishing Rosiak's description of events that involve them. Unjust enrichment is not intended to address that type of harm. It remedies a very different problem, one in which restitution is used to reverse the effects of a voluntary transaction that

---

defamation that that a request for disgorgement would not have supported equitable jurisdiction.").

[103] *Palin v. N.Y. Times Co.*, No. 17-CV-4853 (JSR), 2020 U.S. Dist. LEXIS 11544, at *5-6 (S.D.N.Y. Jan. 21, 2020); *see also Alharbi v. Theblaze, Inc.*, 199 F. Supp. 3d 334, 361 (D. Mass. 2016) (granting summary judgment because no benefit was conferred by the defamatory statements written about the plaintiff from which the publisher generated advertising and subscriber revenue); *cf. Diaz Rodriguez v. Torres Martir*, 394 F. Supp. 2d 389, 391-92, 394 (D.P.R. 2005) (denying summary judgment on claims for libel, unjust enrichment, and violations of his right to self-image, name, and privacy, because, as a well-known celebrity, the plaintiff would "customarily" be paid for promoting products and services and therefore could seek disgorgement for profits obtained by the magazine that used his photo in an advertisement without his consent).

unfairly enriched one party at the expense of the other.[104] Restitution is the

appropriate measure of compensation in those types of cases, while it is not in

defamation cases. Awarding damages for defamation provides financial redress in

the hopes of making the plaintiff whole even if the reputational damage cannot be

entirely undone.[105] Relatedly, damages are typically an adequate mechanism to

recover for the harm caused by defamation without requiring restitution,[106] and we

---

[104] *See, e.g.*, *4934, Inc. v. D.C. Dep't of Emp. Servs.*, 605 A.2d 50, 55 (D.C. 1992) (crediting the Department of Employment Services the amount of money the claimant received from the private party who caused the workplace injury that was the basis for the workers' compensation claim); *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 62 (D.C. 2005) (seeking payment for legal services); *Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 220-21 (D.C. 2021) (returning profits voluntarily shared based on the misunderstanding that a contractual obligation existed).

[105] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 n.9 (1974) ("[T]he law of defamation is rooted in our experience that the truth rarely catches up with a lie.").

[106] *See, e.g.*, *Ventura*, 825 F.3d at 887 (concluding that damages are an adequate remedy for defamation); *Alharbi*, 199 F. Supp. 3d at 361 (same); *Palin*, 2020 U.S. Dist. LEXIS 11544, at *5 (same); *Hart v. E.P. Dutton & Co.*, 93 N.Y.S.2d 871, 880 (N.Y. Sup. Ct. 1949) ("It is evident that the right to recover based upon libel has been limited to the recovery of damages under the common law and statutes applicable thereto. It would seem, therefore, that the law is so well established that an innovation such as the plaintiff seeks in this action would impose new and unnecessary hazards upon publishers and would be contrary to the policy of our law."), *aff'd sub nom. Hart v. E. P. Dutton & Co., Inc.*, 277 A.D. 935, 98 N.Y.S.2d 773 (N.Y. App. Div. 1950).

see no reason to think this case would be an exception to that general rule in the event the plaintiffs prove their defamation claims.

The Awans point to the Restatement (Third) of Restitution and Unjust Enrichment §44 (Am. L. Inst. 2011), which recognizes the validity of using restitution to remedy tortious harms. That said, even under the Restatement, this is not the case for allowing disgorgement of profits because it explains that unjust enrichment should be limited or denied if "the proper measure of recovery poses insurmountable difficulties of calculation."[107] The Awans have identified nine statements in the 311-page book that they claim are defamatory. Allocating the defamatory statements to the profits earned relative to the other statements and topics in the book would pose serious difficulties.

---

[107] *Id.* §44 cmt. d; *see also id.* §44 ("Restitution by the rule of this section will be limited or denied … if the benefit derived from the interference cannot be adequately measured ….").

## V. Conclusion

For the foregoing reasons, we affirm the trial court's denial of the Anti-SLAPP special motion to dismiss the defamation claim. We reverse the court's rulings with respect to the claims for IIED and unjust enrichment.[108] We remand for further proceedings consistent with this opinion.

---

[108] In light of this court's contemporaneous decision in *Banks v. Hoffman*, No. 20-CV-318 (D.C. Sept. 7, 2023), holding that the Anti-SLAPP Act's special-motion-to-dismiss procedure contravenes the Home Rule Act, we refrain from directing the trial court to grant Salem's special motion to dismiss the IIED and unjust enrichment claims with prejudice, as would otherwise be required under D.C. Code §16-5502(d).